[Cite as *State v. Hlinovsky*, 2011-Ohio-6421.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 09 BE 19 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| FREDERICK JOSEPH HLINOVSKY, Jr., | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from Common Pleas
                               Court, Case No. 08 CR 308.

JUDGMENT:                      Affirmed.

APPEARANCES:
For Plaintiff-Appellee:        Attorney Chris Berhalter
                               Prosecuting Attorney
                               Attorney Daniel P. Fry
                               Asst. Prosecuting Attorney
                               147-A W. Main Street
                               St. Clairsville, OH  43950

For Defendant-Appellant:       Timothy Young
                               Ohio Public Defender
                               Kristopher A. Haines
                               Asst. Ohio Public Defender
                               Midland Building
                               250 E. Broad Street, Suite 1400
                               Columbus, Oh  43215

JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich

                               Dated: December 1, 2011

DeGenaro, J.

{¶1} Defendant-Appellant, Frederick J. Hlinovsky, Jr., appeals the decision of the Belmont County Court of Common Pleas convicting him of operating a motor vehicle with a prohibited alcohol concentration in his system with a specification of a previous felony OVI conviction, and sentencing him accordingly. Hlinovsky asserts five arguments; first, that his conviction was against the manifest weight of the evidence. Second, the trial court erred when it failed to instruct the jury regarding the lesser included offense of physical control and to provide limiting instructions regarding his prior convictions. Third, that the prosecutor committed misconduct by reminding a defense witness of perjury and by commenting on Hlinovsky's potential sentence during closing argument. Fourth, that his trial counsel rendered ineffective assistance by failing to request a jury instruction on physical control, failing to request limiting instructions regarding his prior convictions, and failing to object to the prosecutor's misconduct. Finally, that the trial court erred in overruling his motion to suppress the evidence gathered following an unlawful stop.

{¶2} Hlinovsky's five assignments of error are meritless. First, his conviction was not against the manifest weight of the evidence because the jury could have reasonably believed the state trooper's testimony and found the testimony of Hlinovsky and his witnesses incredible. Second, the trial court did not err in failing to instruct the jury on physical control as the lesser included offense of OVI because the evidence did not reasonably support an acquittal on OVI. Third, although the prosecutor's comments during cross-examination and closing argument were improper, when viewed in the context of the entire trial, the comments did not deprive Hlinovsky of a fair trial. Fourth, since Hlinovsky did not request a limiting instruction; the trial court did not err in failing to give one, nor did trial counsel render ineffective assistance because his failure to request jury instructions was trial strategy and the outcome of the trial would not have been different had counsel objected to the prosecutor's improper statements. Finally, the trial court did not err in overruling Hlinovsky's motion to suppress because the officer's initial approach of the vehicle was a consensual encounter; thus, the officer did not need reasonable suspicion of criminal activity. Accordingly, the judgment of the trial court is affirmed.

**Facts and Procedural History**

{¶3}   Hlinovsky was originally indicted in the Belmont County Court of Common Pleas Case No. 08-CR-172; however, a nolle prosequi was entered in that case.  On December 3, 2008, Hlinovsky was reindicted on the same charge by the Belmont County Grand Jury in Case No. 08-CR-308 for operating a motor vehicle while under the influence of alcohol (R.C. 4511.19(A)(1)(i),(G)(1)(e)).   The indictment included a specification that Hlinovsky was previously convicted of a felony OVI offense on March 1, 2004, Case No. 03-CR-178, in the Belmont County Court of Common Pleas.  With the specification, the offense is a third-degree felony.  On December 11, 2008, Hlinovsky was arraigned, pled not guilty, and was appointed counsel.  The court granted a recognizance bond on several conditions, including that Hlinovsky was granted driving privileges limited for employment purposes only.

{¶4}   On February 18, 2009, Hlinovsky filed a six branch motion to dismiss, motion to suppress, and motion to amend the indictment.  Relevant to this appeal, he requested that the court issue an order: 1) dismissing the indictment because the arresting officer lacked probable cause to approach a legally parked vehicle that was not violating any Ohio laws; 2) dismissing this case, or in the alternative, suppressing any chemical tests because the arresting officer lacked probable cause to approach the vehicle and the officer improperly administered the horizontal gaze nystagmus test; and, 3) amending the indictment to R.C. 4511.194 (physical control) because the facts only support that charge and cannot support an OVI charge.  Hlinovsky alleged that when the arresting officer approached his vehicle, the vehicle was parked and not running, the keys were out of the ignition, and he had just entered the driver's seat of the vehicle.  Further, he asserted that he had not operated the vehicle, and it had been operated by the other individual in the passenger seat.

{¶5}   The court held a hearing on the motion to suppress on September 9, 2008, before the original case was dismissed, and defense counsel did not request another hearing when he refiled the motion to suppress in the reindicted case.

{¶6}   The State called Trooper Mark Visvary, who testified that he is assigned to

the St. Clairsville post and has been a state trooper for sixteen years. He first observed Hlinovsky's vehicle traveling westbound on U.S. 40 around 2:53 a.m. on April 30, 2008. He explained that he noticed the vehicle because it was traveling very slowly; the speed limit in that area is 40 miles per hour and he estimated the vehicle was traveling 20 to 25 miles per hour. He caught up to the vehicle, and then the driver put the turn signal on and pulled to the right side of the road near AutoZone. Trooper Visvary explained that when the vehicle pulled off the road, he was behind it and then he drove past it. He testified that it appeared there were two people in the vehicle. He saw a silhouette of the subjects as he traveled by their vehicle and observed that the larger silhouette was in the driver's seat. He explained that he later approached the vehicle and saw that the larger of the two occupants was behind the wheel, which was Hlinovsky.

{¶7} Trooper Visvary testified that after he passed the vehicle, he proceeded westbound and at that point, he did not intend to do anything because he had not observed the vehicle commit any violations. However, when he was about 50 yards from the vehicle, he looked in his rear view mirror and noticed that the vehicle had turned its headlights off. This caught his attention: "I really thought somebody was up to something at that point." He turned around and went back, not because a violation had occurred, but to find out what was going on. He got behind the vehicle, called the stop in as a disabled vehicle, and got out and checked on the occupants' well-being. He testified that from the moment he first saw the vehicle to the time he pulled behind it, he saw no activity inside the vehicle other than turning the headlights off.

{¶8} Trooper Visvary explained that he made contact with the two individuals on the driver's side of the vehicle. Hlinovsky was in the driver's side and Kayla Beeman, Hlinovsky's cousin, was the other individual in the vehicle. The trooper told Hlinovsky why he was there and asked him where he was coming from. Hlinovsky replied he was coming from a friend's. Trooper Visvary detected a moderate odor of alcohol from Hlinovsky, noticed that his eyes were glassy and bloodshot, his movements were slow, his speech was slurred, and he was not coherent in response to some of the trooper's questions. Trooper Visvary asked Hlinovsky if he had any alcohol to drink, and Hlinovsky

said no. Hlinovsky also said that Beeman had contacted him for a ride. Trooper Visvary asked Hlinovsky to perform sobriety tests, and he refused.

{¶9} Trooper Visvary then asked Hlinovsky to exit his vehicle and come back to the patrol car so the trooper could check the status of his driver's license. When Hlinovsky got out of the vehicle, the trooper noticed him staggering somewhat as he was walking. Trooper Visvary asked Hlinovsky again if he had been drinking, and Hlinovsky said no and that he had broken his leg at one of the power plants.

{¶10} In the patrol car, Trooper Visvary told Hlinovsky that he could smell alcohol and asked him again if he had been drinking. Hlinovsky admitted that earlier that night he had one drink. Trooper Visvary then asked Hlinovsky to perform the horizontal gaze nystagmus test, and Hlinovsky allowed him to administer the test. Trooper Visvary observed six out of six factors on the HGN test. He then asked Hlinovsky to perform other field sobriety tests, and Hlinovsky refused. Hlinovsky also refused to do a portable breath test.

{¶11} Trooper Visvary testified that he then advised Hlinovsky that he was placing him under arrest for driving under the influence. Hlinovsky and Beeman were taken to the highway patrol post where Hlinovsky submitted to a urine test. Hlinovsky never indicated in any direct or indirect way that he had not been driving the vehicle. Beeman also never indicated in any way that she had been driving the vehicle.

{¶12} On cross, Trooper Visvary testified that when he approached the vehicle after he pulled behind it, it was not running and he did not remember where he found the keys. He stated that when he first saw the vehicle, he was about 100 to 150 yards away. When asked if he lost sight of the vehicle going around the turn because the road is not a straightway the whole way, he replied that due to the slow speed, he did not. However, Trooper Visvary agreed that he did lose visual contact with Hlinovsky's vehicle for a short time at three points before he pulled behind it.

{¶13} The defense then called Beeman to testify. On April 30, 2008, she and Hlinovsky were at the bar until it closed, and then they left together at approximately 2:20 a.m. She testified that when they left the bar, she drove until they got close to AutoZone

and she pulled off the road. She stated that after she pulled off, they switched seats because she felt like she had too much to drink. She did not know there was an officer in the vicinity when she pulled off the road. She also explained that she had turned the vehicle off and put the keys down, but she did not remember where she put them.

{¶14} On cross, Beeman testified that when she pulled off the road all they were doing was changing seats and she turned the headlights off because Hlinovsky was making a phone call to have someone come pick them up. She confirmed that between April 30 and that present day, she had never told anyone in law enforcement that she was driving the vehicle.

{¶15} On April 3, 2009, the court issued a nunc pro tunc journal entry overruling branches one, two, and three of Hlinovsky's motion. The court found that the State produced sufficient evidence for the matter to be submitted to a jury. The court noted that a police officer may make an investigatory stop when the officer does not witness a traffic violation but has sufficient reason to believe a criminal act is occurring and seeks to confirm or refute this suspicion. The court further found that a very slow moving vehicle traveling on State Route 40 late at night established reasonable suspicion for the initial stop. During the officer's investigation, neither Hlinovsky nor Beeman explained that Beeman was the driver, and unrefuted testimony established that Hlinovsky displayed indicia of intoxication, yet he told the officer he did not have anything to drink. Although Hlinovsky contends that he and Beeman switched seats when the officer lost sight of the vehicle, no explanation was given for why they failed to tell the officer that Beeman had been driving. The trial court found that the State presented sufficient evidence to establish that the officer had reasonable suspicion for the initial stop, and after the investigation, a reasonably articulated indicia of intoxication, establishing the threshold criteria for determining probable cause.

{¶16} On June 2, 2009, the matter proceeded to a jury trial. The State called Trooper Visvary, who testified that when he first saw Hlinovsky's vehicle, he was near the BP station on U.S. 40 and Hlinovsky's vehicle was just west of SummerHill. He noticed the vehicle because it was traveling at an "extremely slow speed." He sped up and

caught up to the vehicle between SummerHill and the AutoZone, which he estimated are approximately 40 yards apart. He said that he did not lose sight of the vehicle.

**{¶17}** Trooper Visvary testified that when he got behind the vehicle, he was approximately three and a half to four car lengths behind it. He observed that, "[t]he window tint on the vehicle appeared to be dark," and there were two people inside in the vehicle. He described the vehicle as a large truck with bucket seats. He stated that "[i]t appeared that the somewhat bigger person was seated behind the wheel of the vehicle." When he later approached the vehicle, he saw that Hlinovsky was the bigger of the two people in the vehicle.

**{¶18}** The trooper testified that the vehicle pulled off the right side of the road into a little private lot, and he drove past it. While watching the vehicle in his rearview mirror, he observed its headlights turn off, and he turned around and went back to check on the vehicle. When he drove past the vehicle, he observed it the whole time in his rearview mirror until he turned around to go back. He estimated that while he was turning around, he was not able to see the vehicle for "probably three to five seconds." He testified that if the passengers were able to switch seats when he could not see their vehicle, they would have had the three to five seconds when he made his turn to do so.

**{¶19}** Trooper Visvary drove back towards the parked vehicle, passed by it, and then made a U-turn and pulled behind it. He did not observe the driver and passenger switching seats at any point. Once he got behind the vehicle, he radioed the St. Clairsville post and reported the license plate. He confirmed that the stature of the two occupants of the vehicle appeared to be the same as what he saw while driving.

**{¶20}** The trooper testified that he approached the vehicle from the driver's side and saw Hlinovsky sitting behind the steering wheel and Beeman sitting in the front passenger seat. He believed the vehicle was still running when he approached it. He stated that he spent approximately 40 to 50 minutes with Hlinovsky that night. During this time, neither Hlinovsky nor Beeman made any indication that they had switched seats and that Beeman was actually driving the vehicle.

**{¶21}** Trooper Visvary testified that he asked Hlinovsky if anything was wrong, and

he replied that he was using his cell phone. The trooper stated that he did not see an indication of anyone using a cell phone when he approached the vehicle; however, when asked if he saw anyone using a cell phone at any time that evening, he said that Hlinovsky may have had one with him, but he did not recall him using it. After Hlinovsky refused to perform the sobriety tests, Trooper Visvary asked him why he had pulled over, and Hlinovsky said that he pulled over because he knew the trooper was going to pull him over.

{¶22} Trooper Visvary further testified that State's Exhibit 3 was a video of his encounter with Hlinovsky's vehicle when he pulled in behind him. He explained that he has a camera on the windshield of his patrol car, and when he pulled behind the vehicle, he believed that the camera automatically came on because he activated his lights. Defense counsel then stipulated to the admission of State's Exhibit 3 and the videotape was played for the jury.

{¶23} On cross, Trooper Visvary testified that the distance between his patrol car and Hlinovsky's vehicle when he first saw it was approximately "a couple hundred yards." He confirmed that he was testifying that with the vehicle traveling 40 yards and himself traveling 200 yards, he was able to get behind the vehicle before it pulled off to the side, and he did not lose sight of it during that time. He estimated that his rate of speed when he was approaching Hlinovsky's vehicle was faster than 45 miles per hour.

{¶24} Trooper Visvary confirmed that immediately after he passed Hlinovsky's vehicle, he lost sight of it before he could view it in his rearview mirror; however, he said it was a short amount of time. He watched the vehicle from his rearview mirror until he made a turn, but his attention was divided. However, he felt that this did not compromise his ability to also focus on the vehicle behind him.

{¶25} The trooper confirmed that he did not see any exhaust coming out of Hlinovsky's vehicle in the video and he agreed that the vehicle was not running when he pulled in behind it and turned on the video. He also confirmed that there is a difference in the law as to whether the vehicle is running or not; if the vehicle is not running, but an impaired person has access to the keys, then that person would be cited for a physical

control violation.

{¶26} Defense counsel then noted that the video showed that there were substantial headrests in the vehicle, and the trooper stated that while watching the video, he did not see any movement above the headrests. However, he explained that during the video, he was almost directly behind the vehicle, but as it pulled over and he drove past it, he had a different view. He also confirmed that his judgment that one occupant of the vehicle was bigger than the other was not in his police report. He then clarified that when he observed Hlinovsky's silhouette, he was passing by the vehicle traveling a lot less than 25 miles per hour as Hlinovsky's vehicle was still moving. He also agreed that he could not fully see the person in the passenger seat at this point to compare the shape he saw in the driver's seat with the passenger.

{¶27} Trooper Visvary testified that he did not test Beeman for alcohol consumption. He asked her if she had been drinking and she said yes, and he made a decision based on his training that she was not fit to drive. He agreed that had she been driving, she would have been guilty of OVI.

{¶28} Trooper Visvary explained that when he told Hlinovsky he was probably going to jail for his second felony OVI offense, Hlinovsky was really concerned about himself. The trooper said that Hlinovsky was not concerned about Beeman at all but wanted to know what was going to happen to him. He further explained that Beeman did not have anyone to pick her up, and Hlinovsky had contacted someone to pick him up. Beeman said that if that person came to pick Hlinovsky up, she would go with them. Trooper Visvary stated the reason he did not put Hlinovsky in jail was that Beeman would not have had a ride home.

{¶29} The trooper explained that he did not find out that Hlinovsky was asserting that Beeman was driving the vehicle until a motions hearing, which took place months before the present hearing. He agreed that since finding out about Hlinovsky's defense, he could have charged him with physical control of a motor vehicle in addition to OVI.

{¶30} On redirect, the trooper testified that based upon what he observed and was told that night, there was no evidence that suggested that Hlinovsky was not driving the

vehicle.

{¶31} The parties stipulated to, and the trial court admitted, State's Exhibit 1, Hlinovsky's urine test results; State's Exhibit 2, the certified copy of Hlinovsky's prior felony OVI conviction; and State's Exhibit 3.

{¶32} The defense then called Beeman, who testified that when she and Hlinovsky left the bar, she drove half a mile down the road, and then pulled over. As soon as she pulled over, a state trooper drove past and then turned around. She stated that the vehicle was completely stopped and she took the keys out of the ignition and dropped them on the floor. She and Hlinovsky switched seats without getting out of the vehicle by her going under him and him going over her. After that, the keys remained on the floor of the vehicle and the vehicle did not move again.

{¶33} Beeman explained that they switched seats because she did not think she was capable to drive due to alcohol consumption. She stated that she did not know what was going to happen at that point after they switched seats, but then agreed that Hlinovsky tried to make a cell phone call to have someone pick them up. She thought he was calling his mother but did not know if he was able to talk to her.

{¶34} Beeman confirmed that she did not tell the trooper that she had been driving the vehicle and explained that she was afraid that she would be in trouble for drinking and driving. She testified that she and Hlinovsky did not discuss that prior to the trooper approaching their vehicle.

{¶35} The defense then called Robert Ranken, Hlinovsky's uncle, as its next witness. Robert testified that he was at the bar and saw Hlinovsky and Beeman, who is his niece. They all left the bar at approximately the same time around when the bar closed. When they left, Ranken's son drove the two of them in his truck, and he saw that Beeman drove and Hlinovsky was the passenger. Robert said that he had a couple beers and felt that he should not be driving, but the alcohol did not affect his ability to recognize who was driving the other vehicle. On cross, Robert confirmed that he did not report anything about Beeman driving the vehicle until the motion hearing, months after the incident. However, on redirect, he testified that he did not know he could have made a

statement to the law enforcement officers regarding Hlinovsky driving the vehicle. He also confirmed that nobody asked him to make a statement.

{¶36} The defense next called Steven Robert Ranken, Hlinovsky's cousin, who testified he was at the bar with his father. He did not drink there because he was driving. He confirmed Robert's testimony that he, Robert, Beeman, and Hlinovsky all left the bar at the same time, and Beeman was driving with Hlinovsky as the passenger. On cross, Steven testified that when he found out that Hlinovsky was charged with felony OVI, he did not contact law enforcement and tell them Hlinovsky was not driving.

{¶37} The defense then called Hlinovsky as its last witness. Hlinovsky testified that he left the bar in his mother's vehicle; he was in the passenger's seat and Beeman was driving. Their vehicle pulled over before they got to the AutoZone, and he explained that Beeman did not feel like she could drive, so he told her to pull over and they switched seats. He did not see the trooper at that time. He explained that after he got in the driver's seat, he saw the trooper turn around by Whiteside's. He stated that he got on the phone and was going to call his friend to come get him, and then he clarified that he thought he was going to call his mother. He did not get ahold of anyone. When the trooper approached their vehicle, he was just hanging up the phone, and he said that he was on the phone.

{¶38} Hlinovsky explained that he did not drive that night because he was "allegedly" pretty intoxicated. He asked Beeman to drive because he thought she was able to do so. He felt it was his fault since he asked her to drive, and he felt obligated to take the OVI instead of her. He further explained that he did not tell the trooper that Beeman was driving because he did not want to get her in trouble. He testified that he was very nervous that night and thought that it would go to court and be resolved.

{¶39} Hlinovsky confirmed that he has had a number of convictions, including a felony OVI in 2002 and three prior OVI's. He had his license suspended, but got it reinstated. His license had been reinstated prior to this offense for three or four years and during that period of time, he was not charged with any criminal offenses. He also stated that he is employed as a union boilermaker and union laborer.

{¶40} On cross, Hlinovsky agreed that he was convicted of OVI on August 31, 1999; July 25, 2001; and August 2001. The State clarified that Hlinovsky was charged with his fourth OVI offense on September 19, 2003, not in 2002. The State also noted that he pled guilty to that offense on March 1, 2004 and it was his fourth conviction for OVI and first felony conviction. Hlinovsky agreed that the current case is the fifth OVI offense he has been charged with, and that he wants them to believe that it was out of his concern for Beeman that he did not tell the officer that she was driving the vehicle.

{¶41} Hlinovsky testified that the trooper's testimony that Hlinovsky was only concerned about getting a ride home for himself was false. He further testified that prior to April 30, 2008, he did not believe Beeman had ever even had a ticket, and assuming Beeman had no OVI record, if she were charged, she would face a first-degree misdemeanor which would typically involve a sentence of three days mandatory minimum in jail or in a program. The State noted that he is charged with a third-degree felony, facing a lifetime license suspension and five years imprisonment, and Hlinovsky said that he was not using his head at the time.

{¶42} In regards to his earlier testimony that "allegedly" he was intoxicated, Hlinovsky clarified that he was not denying that he was drunk that night. He also explained that he told Trooper Visvary that he pulled over because he thought the trooper was going to pull him over because he did not want Beeman to get an OVI, so he lied.

{¶43} Hlinovsky admitted that he lied to the trooper regarding where he was coming from and in response to the trooper's initial questioning if he had been drinking. The State then asked even if Beeman had been driving and Hlinovsky did not want to get her in trouble, why would he lie to the officer about those things. He replied, "I can't answer that, sir. I was intoxicated." He also confirmed that he heard himself tell the trooper on the video that this would ruin his life.

{¶44} The State noted that Hlinovsky and his witnesses' testimony that he was not driving the vehicle was not reported to anyone in the investigation until months later during a motion hearing, and Hlinovsky replied: "I didn't know how this was going to go, so I wanted to keep my mouth shut. I didn't want to tell everybody and everybody know

all my business, sir." He further explained that he wanted to talk to his attorney about it.

**{¶45}** After deliberations, the jury found Hlinovsky guilty of operating a motor vehicle with a prohibited alcohol concentration in his system and found that Hlinovsky was previously convicted of a felony OVI offense, enhancing the current offense to a third-degree felony. On June 4, 2009, Hlinovsky filed a motion requesting that the court grant him permission to attend a doctor's appointment. On that same day, the court issued a journal entry authorizing his release from the Belmont County Jail to attend the appointment. On June 5, 2009, the court issued a warrant for Hlinovsky's arrest for failure to return to the jail after the appointment, which constituted escape. Hlinovsky was arrested on June 8, 2009.

**{¶46}** Following a sentencing hearing, the trial court issued a judgment entry on June 22, 2009, sentencing Hlinovsky to a five year prison term for operating a motor vehicle with a prohibited alcohol concentration in his system, as well as a fine of $2,000 and a lifetime suspension of his driving privileges in Ohio. This sentence was to run consecutively to his sentence for escape in Case No. 09-CR-138, for a definite term of incarceration of seven years.

## Motion to Suppress

**{¶47}** For ease of analysis, the last assignment of error will be discussed first.

**{¶48}** In his fifth assignment of error, Hlinovsky asserts:

**{¶49}** "The trial court committed reversible error when it overruled Mr. Hlinovsky's motion to suppress his unlawful stop by the police, and the evidence gathered following his unlawful stop by the police, in violation of Mr. Hlinovsky's rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10, 14, and 16, Article I of the Ohio Constitution. (Feb. 18, 2009, Motion to Suppress; Apr. 3, 2009, Judgment Entry; Feb. 20, 2009, Pretrial Hearing Tr. 2-5; Sept. 9, 2008, Suppression Hearing Tr. 10-14, 17-30, 35-36; Tr. 172-228)."

**{¶50}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. McNamara* (1997), 124 Ohio App.3d 706, 710, 707 N.E.2d 539. When considering a motion to suppress, the trial court assumes the role of trier of fact and is

therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶8. Accepting these facts as true, the appellate court conducts a de novo review of whether the facts satisfy the applicable legal standards at issue in the appeal. Id.

## Consensual Stop

{¶51} Hlinovsky challenges the trial court's decision to overrule his motion to suppress the evidence gathered following his encounter with Trooper Visvary. Specifically, he asserts that the investigatory stop was improper because the officer had no reasonable suspicion of criminal activity.

{¶52} There are three types of police encounters with citizens: consensual encounters, investigative or Terry stops, and arrests. See *Florida v. Royer* (1983), 460 U.S. 491, 501–507, 103 S.Ct. 1319, 75 L.Ed.2d 229. The first two of these are relevant here.

{¶53} A police encounter is considered consensual where a person is free to walk away from the officer and may refuse to answer questions. *U.S. v. Mendenhall* (1980), 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497. Thus, "there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." Id.

{¶54} Whereas an investigatory, or Terry stop, occurs when the officer stops to investigate unusual or suspicious behavior. The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio* (1968), 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 I.E. 3d 889. An investigatory stop "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *U.S. v. Cortez* (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621.

{¶55} "Generally, when a police officer merely approaches and questions persons

seated within parked vehicles, a consensual encounter occurs that does not constitute a seizure so as to require reasonable suspicion supported by specific and articulable facts." *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, 936 N.E.2d 529, at ¶20, citing *State v. McClendon*, 10th Dist. No. 09AP-554, 2009-Ohio-6421, at ¶8; *State v. Chapa*, 10th Dist. No. 04AP-66, 2004-Ohio-5070, at ¶8; *State v. Szewczyk* (Sept. 14, 1999), 7th Dist. No. 98-CA-20. The United States Supreme Court listed factors that may cause a consensual encounter to become a seizure in *Mendenhall*. These factors include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. at 554.

{¶56} In the instant case, the trooper testified at the suppression hearing that he observed Hlinovsky's vehicle traveling very slowly on U.S. 40 at around 3 a.m. After he caught up to the vehicle, it pulled off to the side of the road, he passed it, and then he saw the vehicle turn its headlights off. This caught his attention, and he explained that he was trying to find out what was going on, so he turned around and pulled in behind the vehicle. He called the stop in as a disabled vehicle and got out to check on the occupants' well-being.

{¶57} In a similar situation, this court held that an officer's approach of a car that voluntarily pulled off the road was a consensual encounter, not an investigatory stop. *State v. Percy*, 7th Dist. No. 04 MA 265, 2006-Ohio-1285. In *Percy*, at around 3 a.m., the officer observed a slow moving vehicle approaching him and he turned around to follow the vehicle and further observe the driving. After the officer began following the vehicle, it pulled to the side of the road and parked. The officer stopped behind the vehicle and activated his lights, before approaching to ascertain if anything was wrong. Id. at ¶2-3. This court found that "these actions did not constitute a seizure for purposes of the Fourth Amendment as a matter of law." Id. at ¶24.

{¶58} We hold that the initial encounter between Hlinovsky and the officer was a consensual encounter, rather than an investigatory stop requiring reasonable suspicion as the trial court found. Like in *Percy*, the trooper did not actually initiate a traffic stop;

rather, he approached a vehicle that had pulled to the side of the road and parked in order to ask the occupants some questions. Furthermore, based on the record, it does not appear that any of the factors from *Mendenhall* were present during this encounter. The trooper testified that he was checking on the well-being of the occupants and told them why he was there and asked where they were coming from. The record does not provide any evidence that the trooper displayed his weapon or touched Hlinovsky nor does it provide evidence that the officer's language or tone of voice suggested that compliance would be compelled.

{¶59} Hlinovsky analogizes his case to *State v. Bacher*, 170 Ohio App.3d 457, 2007-Ohio-727, 867 N.E.2d 864, which the trial court cited in support of its conclusion that a slow moving vehicle driving late at night on U.S. 40 established a reasonable suspicion for the initial stop. In *Bacher*, an officer initiated a traffic stop after observing the defendant travel at a slow speed on the interstate around 3 a.m. Id at ¶2. The First District actually held that a driver's slow speed alone, without accompanying circumstances, can not support reasonable suspicion to initiate a traffic stop for OVI. Id. at ¶5. Hlinovsky asserts that his case is factually analogous to *Bacher*, and the trooper similarly lacked reasonable suspicion to approach his vehicle. However, *Bacher* involved a traffic stop, whereas this case did not. Since this case initially involved a consensual encounter, the officer did not need reasonable suspicion to approach Hlinovsky's vehicle.

### Community Caretaking

{¶60} Hlinovsky further argues that the trooper's approach of his vehicle cannot be categorized as a community caretaking function. This court has recognized that law enforcement officers without reasonable suspicion of criminal activity may approach vehicles that they believe may need assistance as part of the officers' "community caretaking functions." *State v. Elliott*, 7th Dist. No. 01 CO 53, 2002-Ohio-3018, at ¶8-9, citing *State v. Norman* (1999), 136 Ohio App.3d 46, 735 N.E.2d 953. This community caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski* (1973), 413 U.S. 433, 441, 93 S.Ct. 2523.

{¶61} Hlinovsky specifically argues that the community caretaking function does not apply here because there was no evidence that the occupants of the vehicle needed help and because the trooper's testimony that he "really thought somebody was up to something at that point," suggests that the trooper thought that criminal activity was occurring rather than the occupants of the vehicle needed assistance. However, the community caretaking exception is an objective reasonableness standard:

{¶62} "When approaching a vehicle for safety reasons, the police officer must be able to point to reasonable, articulable facts upon which to base her safety concerns. Such a requirement allows a reviewing court to answer *Terry's* fundamental question in the affirmative: 'would the facts available to the officer at the moment of the seizure or the search ''warrant a man of reasonable caution in the belief" that the action taken was appropriate?'" *Norman* at 54, quoting *Terry*, supra, at 21-22.

{¶63} Contrary to Hlinovsky's assertions, the record supports the conclusion that a reasonable officer would believe that the vehicle may need assistance. After traveling well below the speed limit, Hlinovsky's vehicle pulled to the side of the highway by a business at around 3 a.m. and turned off its lights. It is reasonable to believe that a vehicle parked on the side of the road, late at night, in front of a closed business might be disabled or the occupants may need assistance. Therefore, we find that the community caretaking exception applies to this initial encounter.

{¶64} We find that the trooper's initial approach of the vehicle was a consensual encounter such that he did not need reasonable suspicion, and he was carrying out his community caretaking function in assisting a potentially disabled vehicle. Thus, the trial court did not err in overruling Hlinovsky's motion to suppress. Accordingly, his fifth assignment of error is meritless.

### Manifest Weight of the Evidence

{¶65} In his first of five assignments of error, Hlinovsky asserts:

{¶66} "The trial court violated Mr. Hlinovsky's rights to due process and a fair trial when it entered a judgment of conviction for felony OVI, when that judgment was against the manifest weight of the evidence, in violation of Mr. Hlinovsky's rights under the Fifth,

Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. (State's Ex. 1; State's Ex. 2; Tr. 167-68, 171-200, 209-13, 216-18, 221, 226-27, 241-45, 250-72, 275, 300, 306-08, 333-35)."

**{¶67}** When reviewing a judgment under a criminal manifest weight standard of review, "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

**{¶68}** This court's discretionary power to reverse on manifest weight grounds and grant a new trial is exercised only in the exceptional case where the evidence weighs heavily against conviction. *Thompkins* at 387. This standard is a high one because the trier of fact was in a better position to determine credibility issues, by having personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Ali,* 154 Ohio App.3d 493, 2003–Ohio–5150, 797 N.E.2d 1019, at ¶36; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212. A reviewing court therefore should not interfere with the witness credibility and factual determinations of the jury unless the record demonstrates that a reasonable juror simply could not have found the witness to be credible. *State v. Mock,* 187 Ohio App.3d 599, 2010–Ohio–2747, 933 N.E.2d 270, at ¶40.

**{¶69}** Hlinovsky was convicted of operating a motor vehicle while under the influence of alcohol pursuant to R.C. 4511.19(A)(1)(i),(G)(1)(e), which prohibits operating a vehicle if the person has a concentration of "two hundred thirty-eight-thousandths of one gram or more by weight of alcohol per one hundred milliliters of the person's urine" and provides that a person who has previously been convicted of a felony OVI offense is guilty of a third-degree felony.

**{¶70}** Hlinovsky argues that his conviction was against the manifest weight of the evidence, focusing on whether he was the individual who was operating the vehicle

before it pulled off the road and the key was removed from the ignition.

{¶71} At trial, Trooper Visvary testified that he observed Hlinovsky's vehicle traveling very slowly on U.S. 40. He caught up to the vehicle, and then it pulled off to right side of the road and he drove past it. On direct, he stated that it appeared that the larger person was behind the wheel, although he later clarified that he saw the driver's shape as he passed the vehicle and could not fully compare it to the passenger's shape. However, when he later approached the vehicle, he saw that Hlinovsky, who was behind the wheel, was the larger of the two occupants in the vehicle.

{¶72} The trooper further testified that he did not lose sight of the vehicle and never saw the passengers switch seats. He stated on direct that the only opportunity for the occupants to switch seats would have been the three to five seconds he took to turn around when he was not able to see the vehicle. On cross, he also stated that he lost sight of the vehicle for a short period after he passed it before he could see it in his rearview mirror. He also confirmed that his attention was divided between the rearview mirror and the road ahead after he passed Hlinovsky's vehicle, but he did not feel that this compromised his ability to focus on the vehicle.

{¶73} Furthermore, Trooper Visvary testified that neither Hlinovsky nor Beeman told him at any point that Beeman had been driving. The trooper explained that at the patrol post, Hlinovsky was only concerned about what was going to happen to him and was not concerned about Beeman. The trooper concluded that based on what he observed and was told that night, there was no evidence that Hlinovsky was not driving the vehicle.

{¶74} In contrast, Hlinovsky testified that Beeman was driving until she pulled off to the side of the road. He explained that Beeman felt like she could not drive, so he told her to pull over and they switched seats. He testified that he did not tell the trooper that he was not driving because he did not want Beeman to be charged with OVI. Hlinovsky denied that he was only concerned about finding a ride home from the patrol post for himself. He admitted that he lied to the trooper regarding where he was coming from and whether he had been drinking.

{¶75} Both Robert and Steven testified that they saw Beeman driving as she and Hlinovsky left the bar. However, neither of them informed anyone involved in the investigation that Beeman was driving until a motion hearing months later. Beeman also corroborated Hlinovsky's testimony that she drove the vehicle until she pulled off the road because she did not think she was capable to drive. Beeman testified that she did not tell the trooper that she had been driving because she was afraid she would be in trouble for drinking and driving.

{¶76} The evidence in this case consists of conflicting testimony with one party claiming one version of the events and the other party claiming another version. The jury believed the State's testimony and did not find Hlinovsky's claims to be credible. "[D]eterminations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of fact." *State v. Funkhouser*, 7th Dist. No. 02-BA-4, 2003-Ohio-697, at ¶8, citing *DeHass*, supra, at paragraph one of the syllabus.

{¶77} The jury could have reasonably found the trooper's testimony to be the more credible version of events. Neither Hlinovsky nor Beeman told Trooper Visvary that Beeman was driving the vehicle that night. Hlinovsky also admitted that he lied to the trooper regarding whether where they were coming from and whether he had been drinking. These factors weigh against Hlinovsky and Beeman's credibility, and the jury may have considered a lack of credibility in rendering their verdict. Furthermore, a reasonable juror could consider that Hlinovsky's witnesses are all related to him in determining their credibility. The jury could have reasonably found that it was not plausible for Hlinovsky and Beeman to switch seats in the short period it took for the trooper to turn around or the short period it takes to relocate a vehicle in the rearview mirror after passing it. Accordingly, Hlinovsky's conviction was not against the manifest weight of the evidence, and his first assignment of error is meritless.

### Jury Instructions

{¶78} In his second assignment of error, Hlinovsky asserts:

{¶79} "The trial court committed reversible error when it failed to properly instruct the jury regarding its deliberations, in violation of Mr. Hlinovsky's Fifth, Sixth, and

Fourteenth Amendment rights under the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. (Assignment of Error I; State's Ex. 1; State's Ex. 2; State's Ex. 3, Dec. 3, 2008, Indictment; Feb. 19, 2009, Motion to Amend; Apr. 3, 2009, Journal Entry; Jury Instructions; Tr. 5-6, 167-70, 209-16, 235-37, 241-46, 250-72, 281-87, 318-19)."

**{¶80}** Hlinovsky argues that the trial court committed plain error when it (1) failed to instruct the jury regarding the lesser included offense of having physical control of a vehicle while under the influence and (2) failed to provide limiting instructions to the jury regarding Hlinovsky's prior convictions.

**{¶81}** Hlinovsky correctly limits his argument to a plain error analysis, as his trial counsel did not object to the trial court's jury instructions nor did counsel request an instruction on physical control or limiting instructions. An appellate court does not have to resolve an alleged error if it was never brought to the attention of the trial court "at a time when such error could have been avoided or corrected by the trial court." *State v. Carter* (2000), 89 Ohio St.3d 593, 598, 734 N.E.2d 345. In the absence of objection, we may only examine the court's actions for plain error. Id. Plain error should be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. A claim of plain error does not stand unless, but for the error, the outcome of the trial would have been different: "[t]he test for plain error is stringent. A party claiming plain error must show that (1) an error occurred, (2) the error was obvious, and (3) the error affected the outcome of the trial. *State v. Davis,* 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶378.

**{¶82}** First, Hlinovsky claims error in the failure to instruct the jury on a lesser included offense of physical control. In *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph three of the syllabus, the Ohio Supreme Court set forth a three-part test for determining whether one offense is a lesser included offense of another: "i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined,

also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense."

{¶83} The Supreme Court of Ohio later clarified the second prong of the *Deem* test by removing "ever," explaining that this clarification:

{¶84} "[E]liminates the implausible scenarios advanced by parties to suggest the remote possibility that one offense could conceivably be committed without the other also being committed. *Deem* requires a comparison of the elements of the respective offenses in the abstract to determine whether one element is the functional equivalent of the other. If so, and if the other parts of the test are met, one offense is a lesser included offense of the other." *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, at ¶25.

{¶85} A trial court is required to give a jury instruction on a lesser included offense "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, at paragraph two of the syllabus.

{¶86} Hlinovsky was charged with OVI in violation of R.C. 4511.19(A)(1)(i), with a specification that he had been previously convicted of felony OVI, which elevated the offense to a third-degree felony:

{¶87} "(A)(1) No person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply:

{¶88} "(i) The person has a concentration of two hundred thirty-eight-thousandths of one gram or more by weight of alcohol per one hundred milliliters of the person's urine."

{¶89} He contends that the trial court should have given a jury instruction on physical control pursuant to R.C. 4511.194(B)(2), a first-degree misdemeanor:

{¶90} "(B) No person shall be in physical control of a vehicle, streetcar, or trackless trolley if, at the time of the physical control, any of the following apply:

{¶91} "(2) The person's whole blood, blood serum or plasma, breath, or urine contains at least the concentration of alcohol specified in division (A)(1)(b), (c), (d), or (e)

of section 4511.19 of the Revised Code."

**{¶92}** "Physical control" is defined as: "[B]eing in the driver's position of the front seat of a vehicle or in the driver's position of a streetcar or trackless trolley and having possession of the vehicle's, streetcar's, or trackless trolley's ignition key or other ignition device." R.C. 4511.194(A)(2).

**{¶93}** The first and third prongs of the *Deem* test are satisfied here. Physical control carries a lesser penalty than OVI since it is a first-degree misdemeanor. Furthermore, OVI requires operation, which means "to cause or have caused movement" of the vehicle, whereas this element is not required for physical control. R.C. 4511.01(HHH). Although this court has not considered this issue, the Eighth District found that "being in physical control of a vehicle while under the influence in violation of R.C. 4511.194 is likely the lesser included offense of OVI in violation of R.C. 4511.19." *State v. Schultz*, 8th Dist. No. 90412, 2008-Ohio-4448, at ¶31.

**{¶94}** In *State v. Wallace*, 166 Ohio App.3d 845, 2006-Ohio-2477, 853 N.E.2d 704, the First District held that an impaired passenger who grabbed the steering wheel of a car, causing the vehicle to crash, had "operated" the vehicle within the meaning of the statutory definition. The court concluded that the officer had probable cause to arrest the passenger for OVI. Id. at ¶15. The court in *Schultz* recognized that the definition of "operate" in OVI can encompass an impaired passenger, whereas, an impaired passenger could not be convicted of physical control because he or she is not in the driver's seat, but it did not discuss whether this affected if physical control is a lesser included offense of OVI. *Schultz* at fn.6. Thus, it is possible for an impaired passenger to commit OVI but not commit a physical control violation, which seems to conflict with the second prong of the *Deem* test.

**{¶95}** However, we need not conclude whether physical control is the lesser included offense of OVI because we find that the evidence presented at trial would not reasonably support an acquittal on OVI and a conviction on physical control. *Thomas*, supra, at paragraph two of the syllabus. Even if we found that physical control is a lesser included offense of OVI, an instruction on physical control would be required only if the

jury could have reasonably found that Hlinovsky did not operate the vehicle. The evidence that the jury determined to be credible supported a conviction for OVI. It is not reasonable to find that passengers in a vehicle could switch seats in the very short time periods that the trooper testified that he lost visual contact with Hlinovsky's vehicle. Thus, we conclude that the trial court's failure to instruct the jury on the lesser included offense of physical control is not plain error.

### Limiting Instructions-Prior Convictions

{¶96} Second, Hlinovsky claims error in the trial court's failure to give the jury limiting instructions regarding his prior convictions. As discussed above, Hlinovsky did not object or request a limiting instruction, thus plain error review is appropriate.

{¶97} "The existence of a prior offense is such an inflammatory fact that ordinarily it should not be revealed to the jury unless specifically permitted under statute or rule. The undeniable effect of such information is to incite the jury to convict based on past misconduct rather than restrict their attention to the offense at hand." *State v. Allen* (1987), 29 Ohio St.3d 53, 55, 506 N.E.2d 199. When a prior conviction elevates the degree of the offense charged, the prior conviction is an essential element of the offense and the state must prove it as part of its case in chief. *State v. Runner* (May 16, 2001), 7th Dist. No. 99-BA-36. Hlinovsky acknowledges that his prior felony OVI conviction enhanced the degree of his offense and the introduction of this prior conviction was proper.

{¶98} The parties stipulated to Hlinovsky's prior felony OVI conviction, and the court admitted State's Exhibit 2, the certified copy of the conviction. Furthermore, during direct examination, defense counsel questioned Hlinovsky regarding his other prior convictions, including three prior OVI offenses. The State further questioned Hlinovsky regarding the dates of his prior offenses during cross examination.

{¶99} This court has previously held that pursuant to Evid.R. 105, the defendant waived his argument that the trial court erred when it failed to give limiting instructions regarding his prior convictions. *State v. Givens*, 7th Dist. No. 07 CO 31, 2008-Ohio-3434, at ¶84. See, also, *State v. Curtis*, 3d Dist. No. 9-02-11, 2002-Ohio-5409, at ¶25 (finding

no plain error where the trial court did not instruct the jury limiting the use of a prior conviction as an element of the offense and the defendant did not request a limiting instruction). Evid.R. 105 provides: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request of a party, shall restrict the evidence to its proper scope and instruct the jury accordingly." Here, Hlinovsky failed to request a limiting instruction; thus, we find no plain error in the trial court's jury instructions. Accordingly, Hlinovsky's second assignment of error is meritless.

## Prosecutorial Misconduct

{¶100} In his third assignment of error, Hlinovsky asserts:

{¶101} "The prosecutor's misconduct denied Mr. Hlinovsky a fair trial and due process of law, in violation of Mr. Hlinovsky's Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. (Assignment of Error I; Jury Instructions; Tr. 241-46, 250-72, 319-20)."

{¶102} The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136. In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected substantial rights of the appellant. *State v. Smith* (1984), 14 Ohio St.3d 13, 14-15, 470 N.E.2d 883. "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Hanna,* 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, at ¶61, quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940. An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶121. A failure to object to alleged prosecutorial misconduct waives all but plain error. *Hanna* at ¶77; *LaMar* at ¶126.

{¶103} No objections were made to the prosecutor's conduct; thus, we again review under a plain error standard. Hlinovsky asserts that the prosecutor committed

misconduct for two reasons. We will discuss each in turn. First, Hlinovsky alleges that the prosecutor improperly questioned Beeman regarding perjury, thereby suggesting that her testimony was not credible. Specifically, the following exchange occurred between Beeman and the State during cross-examination:

{¶104} "Q. You do understand as you sit here today that you are under oath?

{¶105} "A. I do.

{¶106} "Q. And you're sworn to tell the truth?

{¶107} "A. I do.

{¶108} "Q. And do you understand if it's determined that you are not telling the truth, that you're subject to being charged with perjury?

{¶109} "A. I do.

{¶110} "Q. And it's your testimony under oath today that you were driving that motor vehicle that night that trooper was behind you?

{¶111} "A. Yes."

{¶112} Hlinovsky is correct that reminders of perjury from a prosecutor are ordinarily improper because "[s]uch statements function as backhanded impeachment as well as attempted witness intimidation and express the prosecutor's personal belief or opinion as to the credibility of the witness." *State v. Halley* (1994), 93 Ohio App.3d 71, 79, 637 N.E.2d 937. See, also, *State v. Kerr*, 8th Dist. No. 80272, 2002-Ohio-4190, at ¶64.

{¶113} In *Kerr*, the Eighth District found that although the prosecutor made improper comments regarding perjury to a defense witness during cross examination, when viewing the trial as a whole, the defendant was not deprived of a fair trial. Id. at ¶89. The court explained that the defendant was not prejudiced by the improper remarks because the witness was not intimidated and stood by her testimony. Id. at ¶88. Further, the state properly impeached the witness by introducing photographs and the prosecutor highlighted the inconsistencies in her testimony during closing argument, which allowed the jury to perform its function by judging her credibility. Id. at ¶89.

{¶114} Similarly here, the prosecutor's references to perjury did not intimidate

Beeman. She did not recant her testimony that she was driving the vehicle, but rather stood by her claim throughout the trial. Further, after his improper comments, the prosecutor questioned Beeman regarding what she told the trooper that night, and she confirmed that neither she nor Hlinovsky informed the officer that she had been driving. Additionally, after Beeman testified, both Robert and Steven testified that they observed Beeman driving as she and Hlinovsky left the bar. These witnesses bolstered Beeman's testimony and the prosecutor did not improperly suggest that they were not credible. Thus, the jury could have determined Beeman's credibility on its own despite the prosecutor's improper comments implying perjury.

{¶115} Hlinovsky argues that he was prejudiced by the prosecutor's comments since Beeman testified she was the culpable individual; thus, she was the key to his defense and the prosecutor's comments lent distrust to her testimony. Hlinovsky asserts that absent these comments, the outcome of the trial would have been different. It is true that witness credibility was important in this case of conflicting testimony where one party claimed one version of the events and the other party claimed another. Hlinovsky denied that he was driving the vehicle, and his testimony was corroborated by Beeman's testimony that she was driving. Whereas, the trooper testified that he did not see the occupants of the vehicle switch seats, he only lost visual contact of the vehicle for a very short period of time, and the silhouette he saw while passing the vehicle was consistent with the conclusion that Hlinovsky was driving. However, the prosecutor's suggestion of perjury was an isolated incident in the trial, and as discussed above, other witnesses independently bolstered Hlinovsky's claim that Beeman was the driver. Thus, when viewed in the context of the entire trial, the prosecutor's reminders of perjury did not deprive Hlinovsky of a fair trial.

{¶116} Second, Hlinovsky asserts that the prosecutor committed misconduct when he commented on the potential penalties that Hlinovsky faced if he were convicted of the OVI offense in an attempt to attack the credibility of Hlinovsky's defense. During his rebuttal closing argument, the prosecutor stated:

{¶117} "Now, does that sounds to you like someone who wasn't driving that car

that night?  The individual who has the most to lose in this case, Mr. Hlinovsky, facing a third degree felony, facing five years in the penitentiary, facing a lifetime license suspension now comes before you and says, although I lied to the police officer on April 30th about everything that he asked me, I now want you to believe me, a year later, that I wasn't driving that vehicle.  That's what he's asking you to do.  He has the most to lose. And now he's coming before you and said, I really wasn't driving the vehicle."

**{¶118}**  We note that although not mentioned in Hlinovsky's brief, the prosecutor also commented on the potential sentence Hlinovsky faced during cross-examination in comparison to the sentence Beeman would face if she were charged with OVI: "But instead, you take the wrap [sic] for a third degree felony, facing a lifetime license suspension and five years in the penitentiary."

**{¶119}**  When reviewing the statements a prosecutor makes during closing argument for prosecutorial misconduct, the Ohio Supreme Court has instructed appellate courts to give prosecutors "a certain degree of latitude in summation.  The prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument.  We view the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial." *State v. Treesh* (2001), 90 Ohio St.3d 460, 466, 739 N.E.2d 749 (internal citations omitted).

**{¶120}**  Despite the fact that prosecutors are encouraged to argue fervently for conviction, see *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 263 N.E.2d 773, a prosecutor cannot express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused.  *State v. Smith* (1984), 14 Ohio St.3d 13, 13-14, 470 N.E.2d 883.  Furthermore, a prosecutor cannot go beyond the evidence which is before the jury when arguing for a conviction. Id.

**{¶121}**  "The penalty faced by an accused is a matter strictly for consideration by the judge, not by the jury." *State v. Miller* (Oct. 31, 1997), 7th Dist. No. 15552, citing R.C. 2945.11.  Thus, we find it was improper for the prosecutor to comment on the potential penalty Hlinovsky faced as a method to undermine his credibility.  The prosecutor should have avoided commenting on punishment, a matter beyond the scope of the jury's

consideration; however we find that, but for this comment, the outcome of the trial would not have been different. The court instructed the jury that closing arguments are not evidence. More importantly, as discussed above, other factors that the jury could have properly considered weighed strongly against Hlinovsky's credibility.

**{¶122}** Although we find that the prosecutor's comments were inappropriate and regrettable, we ultimately conclude that they did not deprive Hlinovsky of a fair trial. Even absent the improper comments, we do not find that the outcome of the trial clearly would have been different. Accordingly, Hlinovsky's third assignment of error is meritless.

### Ineffective Assistance of Counsel

**{¶123}** In his fourth assignment of error, Hlinovsky asserts:

**{¶124}** "Defense counsel rendered ineffective assistance of counsel in violation of Mr. Hlinovsky's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. (Assignment of Error I; Assignment of Error II; Assignment of Error III; June 22, 2009, Sentencing Entry; Tr. 167-70, 209-16, 241-46, 250-72, 318-19)."

**{¶125}** To prevail on a claim of ineffective assistance of counsel, an appellant must satisfy the two-pronged test of *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, the appellant must establish that counsel's performance fell below an objective standard of reasonable representation. Id. Second, the appellant must demonstrate that he was prejudiced by counsel's performance. Id. To establish prejudice, an appellant must show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694.

**{¶126}** The appellant bears the burden of proof in demonstrating ineffective assistance of counsel. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 289, 714 N.E.2d 905; *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 17 OBR 219, 477 N.E.2d 1128. When evaluating an ineffective assistance of counsel claim, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland* at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."

*State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373. If an appellant cannot show how counsel's errors undermined the reliability of the court's decision, there is no basis for finding that appellant's right to counsel had been violated. *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, at ¶109; *Strickland,* at 693.

{¶127} Hlinovsky claims ineffective assistance of counsel for three reasons. We will discuss each in turn. First, Hlinovsky contends that his trial counsel was deficient for failing to request a jury instruction on the lesser included offense of physical control. He notes that his trial counsel argued that physical control applied throughout the trial, and his failure to request this lesser included offense was not reasonable trial strategy.

{¶128} The Ohio Supreme Court has held: "Failure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel." *State v. Griffie* (1996), 74 Ohio St.3d 332, 333, 658 N.E.2d 764.

{¶129} Hlinovsky's trial counsel did address the charge of physical control repeatedly during the trial. He stated during opening argument that:

{¶130} "I would like to tell you that I believe that the evidence is going to show that my client is guilty. * * * However, it's not going to show that he's guilty of what he has been charged with. * * * The interesting thing is that there is another statute that if you were to erase operation of motor vehicle and put in here physical control of a motor vehicle, which in essence means that you're seated in a vehicle, in control of a vehicle but it's not operating, then all of these things together creates another offense and that's what we believe the evidence is going to produce today."

{¶131} Furthermore, during closing arguments, counsel further argued, "We talked a little bit about physical control yesterday and that may be a confusing element for you in the jury room. Fred could still be charged with physical control. Just because he hasn't been charged at this point, I believe he can still be charged that way. You do not have an option here of convicting him of physical control because that charge is not before you."

{¶132} Thus, Hlinovsky's trial counsel was attempting to convince the jury that Hlinovsky was charged with the wrong offense. Rather than request an instruction on a

lesser included offense, counsel's strategy was to seek a full acquittal since the correct charge was not before the jury. Accordingly, counsel's failure to request an instruction on physical control was trial strategy and did not amount to deficient performance.

{¶133} Second, Hlinovsky claims that his counsel acted deficiently in failing to request a limiting jury instruction regarding his prior convictions. An attorney's decision not to request a limiting instruction regarding prior convictions may be a tactical strategy rather than ineffective assistance of counsel. *State v. Kinney*, 4th Dist. No. 07CA2996, 2008-Ohio-4612, at ¶20; *State v. Essinger*, 3d Dist. No. 5-03-15, 2003-Ohio-6000, at ¶34. See, also, *State v. Schaim* (1992), 65 Ohio St.3d 51, 61 fn.9, 600 N.E.2d 661 (recognizing that the decision not to request a limiting instruction may be tactical).

{¶134} Even if we found that the failure to request a limiting instruction was not reasonable representation, Hlinovsky was not prejudiced as a result of his counsel's performance. Hlinovsky argues that a limiting instruction would have prevented his conviction resulting from the jury's unrestrained consideration of his prior convictions. However, as discussed in the first and second assignments of error, the State presented credible evidence that Hlinovsky was operating the vehicle that night, whereas, Hlinovsky and Beeman's testimony was undermined by their failure to tell the trooper that Beeman was driving. Hlinovsky further undermined his credibility through the lies he told the trooper. Thus, even if counsel had requested a limiting instruction, we find that the result of the trial would not have been different.

{¶135} Third, Hlinovsky alleges his trial counsel was ineffective for failing to object to the prosecutor's improper remarks during his cross-examination of Beeman and during rebuttal closing argument. He argues that counsel failed to take advantage of curative jury instructions or to argue that the court should declare a mistrial.

{¶136} As discussed in the third assignment of error, the prosecutor's remarks that Hlinovsky challenges were improper. Counsel should have objected to these comments. However, considering the isolated nature of these comments and the ability of the jury to independently determine the credibility of Beeman and Hlinovsky, as discussed in the third assignment of error, the outcome of the trial would not have been

different had counsel objected to these statements or had a curative instruction been given.

**{¶137}** Furthermore, a trial court may declare a mistrial where counsel improperly comments on matters the jury cannot consider, such as punishment. See *State v. Abboud* (1983), 13 Ohio App.3d 62, 63-64, 468 N.E.2d 155. However, "mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." *State v. Reynolds* (1988), 49 Ohio App.3d 27, 33, 550 N.E.2d 490. In this case, although the prosecutor improperly commented on punishment during rebuttal closing argument, the court instructed the jury that closing arguments are not evidence, and the jury could determine Hlinovsky's credibility on its own notwithstanding the improper remarks. Therefore, we find there was not a reasonable probability that the trial court would have granted a motion for a mistrial.

**{¶138}** Thus, Hlinovsky suffered no prejudice as a result of his counsel's failure to object to the prosecutor's comments. Accordingly, Hlinovsky's fourth assignment of error is meritless.

**{¶139}** In conclusion, Hlinovsky's five assignments of error are meritless. His conviction was not against the manifest weight of the evidence because the jury reasonably believed the state trooper's testimony and found the testimony of Hlinovsky and his witnesses to be incredible. The trial court did not err in failing to instruct the jury on physical control as a lesser included offense of OVI because the evidence did not reasonably support an acquittal on OVI. Since Hlinovsky did not request a limiting instruction, the trial court did not err in failing to give one. Although the prosecutor's comments during cross-examination and closing argument were improper, when viewed in the context of the entire trial, they did not deprive Hlinovsky of a fair trial. Trial counsel did not render ineffective assistance of counsel because his failure to request jury instructions was trial strategy and the outcome of the trial would not have been different had counsel objected to the prosecutor's improper statements. Finally, the trial court did not err in overruling Hlinovsky's motion to suppress because the trooper's initial approach

of the vehicle was a consensual encounter and he was carrying out his community caretaking function. Accordingly, the judgment of the trial court is affirmed.

Waite, P.J., concurs.

Vukovich, J., concurs.