[Cite as *State v. Starcher*, 2013-Ohio-5533.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO,                          )
                                        )       CASE NO.    13 JE 1
     PLAINTIFF-APPELLEE,              )
                                        )
VS.                                     )       O P I N I O N
                                        )
BARRY STARCHER,                         )
                                        )
     DEFENDANT-APPELLANT.             )


CHARACTER OF PROCEEDINGS:                Criminal Appeal from Common Pleas
                                        Court, Case No. 11CRB347.


JUDGMENT:                                Reversed; Vacated; Remanded.


APPEARANCES:
For Plaintiff-Appellee:                  Attorney Jane Hanlin
                                        Prosecuting Attorney
                                        Attorney Jeffrey Bruzzese
                                        Assistant Prosecuting Attorney
                                        16001 State Route 7
                                        Steubenville, Ohio  43952

For Defendant-Appellant:                 Attorney Thomas Watkins
                                        3393 Churchill Downs
                                        Stow, Ohio  44224


JUDGES:
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite
Hon. Mary DeGenaro


                                        Dated:  December 9, 2013

VUKOVICH, J.

**{¶1}** Defendant-appellant Barry Starcher appeals the decision of Jefferson County Court District III denying his motion to suppress. In denying the suppression motion, the trial court determined that the officer "relied upon sufficient facts, which gave rise to a reasonable suspicion for him to make the initial investigative stop." For the reasons expressed below, we disagree with the trial court's conclusion that the initial stop was an investigatory stop. As discussed below, the officer's testimony leads to only one conclusion, that he was engaged in a community care taking function when the initial stop was made. Thus, the trial court's conclusion that the initial stop was an investigatory stop is erroneous as a matter of law. The judgment of the trial court is reversed and the matter is remanded for further proceedings.

<u>Statement of the Case and Facts</u>

**{¶2}** On December 25, 2011 at approximately 10 p.m. Starcher and his boyfriend, James Coil, were sitting on a guardrail located on County Road 7E, underneath the overpass of State Route 7, in Brilliant, Jefferson County, Ohio. Wells Township Police Department Officer Jeffrey Kamerer was called out for a downed tree. While en route to that destination he saw appellant and Coil. He stopped and asked them if everything was okay. The lights and siren on the cruiser were not activated. It was dark outside and cold and this was not a usual location where he saw people loitering.

**{¶3}** At this point Officer Kamerer and Starcher's version of what transpired diverges. Officer Kamerer claims that after he rolled the down the window and asked Starcher and Coil if they were alright, they responded in an aggressive manner and started cursing at him. Tr. 76. He then put his car in park, radioed the dispatch center for the sole purpose of letting them know that he "was out with two males". Tr. 78; Exhibit C (Investigator Notes). He then exited the cruiser and asked them what they were doing. Tr. 78; Exhibit C. Coil then began walking away. The officer called for Coil to come back, which he did. Tr. 78. The officer then asked them "What's going on?" Tr. 78. According to the officer, at that point, Coil shoved him. Tr. 78.

The officer then advised dispatch that he needed back up. Exhibit C. He testified that he called for back-up because of the way they were acting towards him. Tr. 80.

**{¶4}** His testimony indicates that he asked the two men for their identification after they were yelling at him, but it does not specifically indicate whether he asked for their identification before or after he was shoved. In the Investigator Notes, the officer stated:

> One male who was later identified as, Jimmy Coil pushed me and replied "get the fuck away from us". I advised dispatch that I needed another unit for assistance. I was trying to ask both males for identification and they still refused and became very combative towards me.

Exhibit C. The officer also testified:

> Q. And – and at what – at some point do you ask the men to identify themselves?
>
> A. Yes.
>
> Q. Where on the timeline did – did that request for identification come?
>
> A. When – when did I ask?
>
> Q. Yeah. Is that after they started yelling?
>
> A. Yes.

Tr. 81.

**{¶5}** In response to being asked for their identification, Coil threw a prescription pill bottle at the officer. Tr. 81. Officer Kamerer claimed that both men were screaming at him that they were not going to give their information and he was being shoved and pushed. Tr. 81. It was at that point that he advised them they were under arrest. Tr. 81.

**{¶6}** It is noted Officer Kamerer did not testify that Starcher pushed him, rather, he claimed that Starcher was screaming and cursing. When asked how Starcher reacted to being advised he was under arrest the officer stated, "Screaming

at me, cussing at me. He was trying to calm Mr. Coil down and he would interfere with me and Mr. Coil, scream at me." Tr. 82.

{¶7} According to the officer, Coil's reaction to being advised that he was under arrest was to partially walk and partially run away from the officer. Tr. 82. The officer, however, eventually caught him. Tr. 82. Coil was then maced, taken to the ground and handcuffed. During this time, Starcher was screaming, slapping and tugging on Officer Kamerer's shirt and interfering with the arrest of Coil. Tr. 83-84. At some point, Officer Kamerer maced Starcher, took him to the ground and put a knee in his back. He was not handcuffed because Officer Kamerer did not have a second set of handcuffs.

{¶8} Starcher gave a video statement to the police the day after this event occurred. The video statement was played during the suppression hearing. In that statement, Starcher explained that he and Coil had walked to a friend's house and were on their way back home when they stopped to rest on the guardrail. Tr. 19-21. Officer Kamerer then pulled up and asked if anything was wrong. Tr. 21. They responded by indicating that they were just sitting there and were on their way home. Tr. 22. Starcher stated that Officer Kamerer then asked for their names. Instead of giving it to the officer, Starcher told the officer, "I'm not sure I should give you that. Why do you need that?" Tr. 22. According to Starcher, Coil gave the officer his name, social security number and handed him a pill bottle as proof of the information because he did not have any other ID on him. Tr. 20. Coil then started walking away. Tr. 22. Starcher further explained:

> That's how that conversation started. Jimmy [Coil] – I guess Jimmy was real irritated with Officer Kamerer. So – with his questioning because just as soon as – as soon as I asked him why he needed to know Jimmy got up and started to walk away and then Officer Kamerer flew the door – the door flew open, he flew up out of the car and said "You better do what the fuck I tell you when I tell you" and that is what started it.

Tr. 27.

{¶9} Starcher stated that Officer Kamerer had his flashlight in his hand and was rearing it back like he was going to hit one of them with it. Tr. 29. Starcher indicated that he was pleading with Officer Kamerer to not hurt Coil and to just let him go since he already had given the officer his name. Tr. 30. Starcher stated that during this encounter Coil was screaming about police brutality even though the officer had not put his hands on either of them. Tr. 34. Starcher claimed that he was trying to defuse the situation by telling Coil not to go and that they should "figure this out" and even put his hand over Coil's mouth. Tr. 29-30, 35. However, Coil continued to walk away and Officer Kamerer started to pursue Coil. Tr. 35. This resulted in an altercation between the officer and Coil. According to Starcher, Coil was then taken to ground, handcuffed and mace is sprayed into his eyes. Tr. 40. Starcher watched this occur while standing at the side of the road. Officer Kamerer then approached him, sprayed mace in his eyes and took him to the ground. Tr. 42. He claimed he did not reach for or touch Officer Kamerer, but rather was yelling at him to not hurt Coil. Tr. 42-44. Starcher indicated that Officer Kamerer never told either of them that they were under arrest or that he needed to ask them questions. Tr. 38.

{¶10} As a result of these actions, Starcher was charged with obstructing official business in violation of R.C. 2921.31, a second-degree misdemeanor, and failure to disclose personal information in violation of R.C. 2921.29(A), a fourth-degree misdemeanor. 12/28/11 Complaint. Originally Starcher pled no contest to the charges. 12/28/11 J.E. However, that plea was later vacated and a motion to dismiss, which more appropriately should have been titled as a motion to suppress, was filed. 01/10/12 Vacation Motion; 02/08/12 J.E.; 02/28/12 Motion To Dismiss. Following a hearing, the trial court denied the motion to dismiss. 06/11/12 J.E.

{¶11} Thereafter the state and Starcher reached a plea agreement. Starcher pled no contest to the failure to disclose personal information charge and the state dismissed the obstruction of official business charge. Starcher was sentenced to pay all court costs and was given credit for time served; however, no fine or probation

were ordered. 12/13/12 J.E. Starcher then filed a timely notice of appeal from the suppression ruling.

## Assignment of Error

{¶12} "Whether if the Appellant-Plaintiff's constitutional rights were violated because he was stopped without probable cause or a reasonable suspicion that he had committed a crime?"

{¶13} Appellate review of a suppression decision presents a mixed question of law and fact. *State v. Roberts,* 110 Ohio St .3d 71, 2006–Ohio–3665, 850 N.E.2d 1168, ¶ 100. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills,* 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). Thus, a trial court's factual findings are afforded great deference and an appellate court will accept them if they are supported by competent, credible evidence. *State v. Fanning,* 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). That said, the trial court's legal conclusions are reviewed *de novo. State v. Burnside,* 100 Ohio St.3d 152, 2003–Ohio–5372, 797 N.E.2d 71, ¶ 8.

{¶14} In denying the suppression motion, the trial court made the following findings:

> After hearing the testimony and evidence as well as the oral arguments of counsel, the Court finds that Wells Township Police Officer James Kamerer relied upon sufficient facts, which gave rise to a reasonable suspicion for him to make the initial investigative stop.
>
> The Court further finds that immediately thereafter, Officer James Kamerer had sufficient probable cause to arrest the defendant, Barry Starcher, based on the evidence and testimony presented at the hearing.

06/11/12 J.E.

{¶15} Ohio law recognizes three types of police-citizen encounters: consensual encounters, *Terry* stops (investigatory detention), and arrests. *State v. Taylor,* 106 Ohio App.3d 741, 747–749, 667 N.E.2d 60 (2d Dist.1995).

{¶16} By stating that Officer Kamerer had a reasonable suspicion to make the initial investigative stop, the trial court found that Officer Kamerer's encounter with Starcher, from the beginning, was a *Terry* stop.

{¶17} It is well-established that an investigatory stop is proper when the facts demonstrate that the officer possessed a reasonable articulable suspicion which, in conjunction with rational inferences, warranted a belief that criminal behavior is occurring or is imminent. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 (1968). Reasonable suspicion entails some minimal level of objective justification, "that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones,* 70 Ohio App.3d 554, 556–57, 591 N.E.2d 810 (2d Dist.1990), citing *Terry* at 27; *State v. Carter,* 69 Ohio St.3d 57, 66, 630 N.E.2d 355 (1994) (concluding a police "officer's inarticulate hunch will not provide a sufficient basis for an investigative stop"). *See also State v. Carlson,* 102 Ohio App.3d 585, 590, 657 N.E.2d 591 (9th Dist.1995). The propriety of an investigative stop must be viewed in light of the totality of the circumstances. *State v. Bobo,* 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), ¶ 2 of the syllabus. Courts generally consider factors such as the high-crime nature of the area, the time of day, the experience of the officers involved, whether the officer was away from his cruiser, and suspicious activities by the defendant, such as furtive gestures. *Id.* at 179-180. For instance, a suspect's unprovoked flight upon seeing the police can justify a seizure when it occurs in a high-crime neighborhood because it is a furtive gesture. *Illinois v. Wardlow*, 528 U .S. 119, 123, 120 S.Ct. 673 (2000); *State v. Jordan,* 104 Ohio St.3d 21, 2004–Ohio–6085, 817 N.E.2d 864.

{¶18} At the suppression hearing, Officer Kamerer testified to the circumstances that brought him to Starcher. He explained that it was cold and dark on Christmas night and Starcher and Coil were sitting on the guardrail under the overpass. Tr. 75-76. He stated that this area is a high crime area; a gas station and storage facility had been broken into and recently a car had been stolen. Tr. 84-85. Officer Kamerer explained upon approaching the individuals he rolled down his window and asked them if everything was okay. Tr. 76. He claims that they

responded by cursing at him and that Coil then started walking away. Tr. 76-78. The prosecutor then asked if there was anything that was suspicious that caused him to stop his cruiser and question the individuals. He responded with the following:

> A. It was where they was sitting. It was on the guardrail under – under a State route. It was close to the roadway, the time of the night, where they was, the traffic that runs through there, somebody could have got hurt from where they was.

Tr. 79.

{¶19} Considering this information we cannot conclude that when Officer Kamerer initiated the encounter with Starcher he had a reasonable articulable suspicion that criminal activity was afoot. It is acknowledged that there is evidence that the area in which Starcher was sitting is high crime area. However, mere presence in a high crime area is not a sufficient basis to justify an investigative stop. *Brown v. Texas,* 443 U.S. 47, 51–52, 99 S.Ct. 2637 (1979); *Carter,* 69 Ohio St.3d at 65. "The setting can inform the officer's judgment, but it does not make the act criminal. In order to detain an individual to investigate for crime, some nexus between the individual and specific criminal conduct must reasonably exist and must be articulated by the officer." *State v. Ferrante*, 196 Ohio App.3d 113, 2011-Ohio-4870, 962 N.E.2d 383, ¶ 26 (2d Dist.). Officer Kamerer merely described their behavior that caused him to stop as sitting on a guardrail. Admittedly, Coil walked away after Officer Kamerer asked if everything was okay. However, that action is not a furtive gesture or suspicious. In *Wardlow*, the act of fleeing was considered suspicious because it occurred prior to the police contacting the individual; the individual saw the police and then ran. *Wardlow*, 528 U.S. at 122. Here, the contact was made and then Coil walked away. It is also acknowledged that Officer Kamerer claimed that upon asking Coil and Starcher if everything was okay, they cursed at him. However, this act also occurred after the initial contact was made.

{¶20} Moreover, the most telling aspects of the encounter that lead to the conclusion that it was not initially an investigatory stop is the first question Officer Kamerer asked Starcher and Coil upon speaking to them and his admitted reason for

stopping. He indicated he stopped because of where they were sitting and the fact that somebody could have gotten hurt. The question he asked them after he rolled his window down was, "Is everything okay?" Tr. 76. The question he asked and the stated reason for stopping indicates he did not stop because he had a reasonable articulable suspicion of criminal activity. Rather, both show that the officer was engaging in a community caretaking function. He was attempting to ensure that no one got hurt and/or that everything was alright with these two individuals.

**{¶21}** Therefore, based on the above, we find that the trial court incorrectly determined that the encounter between Starcher and Officer Kamerer began as an investigatory stop. As a matter of law, the initial encounter was a consensual encounter; there is no evidence in the record of a reasonable articulable suspicion of criminal activity to initiate the stop.

**{¶22}** However, this does not mean the officer violated Starcher's Fourth Amendment rights when he stopped to ask if Starcher and Coil were alright. When an officer is engaging in a community caretaking function, such as the one here, the officer does not need a reasonable suspicion of criminal activity prior to approaching the vehicle. *State v. Shelley*, 7th Dist. No. 12CO25, 2013-Ohio-1116, ¶ 23-25; *State v. Hlinovsky*, 7th Dist. No. 09BE19, 2011-Ohio-6421, ¶ 26; *State v. Perryman*, 8th Dist. No. 82965, 2004-Ohio-1120, ¶ 15. The encounter is consensual; it is not investigatory. *Shelley*; *Hlinovsky*; *Perryman*. Therefore, although Officer Kamerer did not have a reasonable suspicion of criminal activity, based on the community caretaking function he was authorized to stop and see if Starcher and Coil were alright.

**{¶23}** During consensual encounters, an officer is permitted to request information, such as identifying information, from the person the officer is talking to. *United States v. Mendenhall,* 446 U.S. 544, 555–556, 100 S.Ct. 1870 (1980). However, because it is a consensual encounter, the individual remains free to disregard the questions and walk away. *Id.* A consensual encounter remains consensual even if police officers ask questions, ask to see the person's identification or ask to search the person's belongings, provided "the police do not convey a

message that compliance with their requests is required." *Bostick* at 435; *Florida v. Rodriguez,* 469 U.S. 1, 4–6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984); *Immigration & Naturalization Serv. v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). Encounters that involve "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" are all examples of circumstances where consensual encounters may become seizures. *Mendenhall* at 554–555.

{¶24} That said, consensual encounters can legitimately turn into investigatory stops once a reasonable articulable suspicion of criminal activity presents itself. *State v. Rappley*, 2d Dist. No. 11-CR-2693, 2013-Ohio-964, ¶ 20-31.

{¶25} The problem we have with determining in this case if an illegal seizure occurred or if the consensual encounter evolved into an investigatory stop is that to do so we would have to resolve factual questions and evaluate the credibility of the witnesses. The witnesses' testimony in this case is in conflict and depending on what portion or portions of each witness' testimony is believed the result may be different.

{¶26} Witness credibility and resolution of factual determination are best left to the trial court and are afforded great deference. *Mills*, 62 Ohio St.3d at 366. The trial court did not decide this case from the perspective that the encounter was a consensual encounter. Rather, it decided it from the perspective that the initial stop was an investigatory stop. Therefore, once the trial court determined that the stop was an investigatory stop, Starcher was required to comply with Officer Kamerer's order to provide his identification. Failure to do so would be a violation of R.C. 2921.29(A)(1). That section provides that "no person who is in a public place shall refuse to disclose the person's name, address, or date of birth, when requested by a law enforcement officer who reasonably suspects * * * the person is committing, has committed, or is about to commit a criminal offense." This is somewhat of a codification of *Terry* because it makes it illegal to fail to give indentifying information when the officer has a reasonable suspicion of criminal activity. Refusing to comply with that request provided probable cause to arrest. Thus, in deciding the case in the

manner that it did, the trial court did not consider the witnesses' credibility in determining if the officer overstepped his authority during the consensual encounter and an illegal seizure occurred, or if the officer acted within his authority and the actions of Starcher and Coil changed the encounter from consensual to investigatory.

**{¶27}** For the foregoing reasons, the judgment of the trial court regarding the suppression ruling is reversed and vacated and the matter is remanded for further proceedings. Upon remand, in considering the suppression motion, the trial court must first determine which facts it finds credible. Then in applying those facts to the law, the court should determine whether during the consensual encounter the officer showed an exertion of authority that resulted in an illegal seizure, or if the actions of Starcher and Coil changed the encounter from consensual to investigatory.

Waite, J., concurs.
DeGenaro, P.J., concurs.